

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0242-19

---

### WILLIAM ROGERS, Appellant

### v.

### THE STATE OF TEXAS

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### REFUGIO COUNTY

---

RICHARDSON, J., filed a concurring opinion in which HERVEY, WALKER, and SLAUGHTER, JJ., joined.

### CONCURRING OPINION

Today the Court grants the State's Motion to Abate Proceedings and Withdraw Opinions because this Court was informed that Appellant died prior to our reversing the trial court, the court of appeals, and granting him a new trial. From the onset of trial, the State has fought to silence Appellant that started when they convinced the trial judge to

deprive him of his constitutional right to present a defense to the charges filed by the State.[1] The State succeeded in obtaining a 40-year sentence because an embargo was placed on almost all evidence that would have not only raised his claim to self-defense independently, but also would have corroborated that evidence with testimony that was excluded in a Bill of Exception. The State has maintained that position through the entire trial and appellate process. First, the Thirteenth Court of Appeals affirmed the conviction from the trial court. In round two, this Court in a 9-0 opinion finding harm, reversed and remanded the case back to the court of appeals for an error analysis. The State prevailed in round three when the court of appeals, yet again, affirmed the conviction by finding no error. Then in round four of this appellate process, this Court granted review for the second time where we found harm and error, and then reversed and remanded the case to the trial court for a new trial based on those erroneous decisions that excluded any defensive evidence and charges.[2]

---

[1] We point to Texas Code of Criminal Procedure Article 2.01 which states in relevant part:

> It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done. *They shall not suppress facts or secrete witnesses capable of establishing the innocence of the accused.*

As the United States Supreme Court once famously stated regarding prosecutors:

> But while he may strike hard blows, he is not at liberty to strike foul ones. *It is as much his duty to refrain from improper methods calculated to produce wrongful conviction* as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935) (emphasis added).

[2] For instance, the State asserted that self-defense can never rationally apply to Burglary of a Habitation—predicated on Aggravated Assault—even though evidence suggested he had consent to be in the home. In our second opinion, this Court responded:

The State of Texas, in lockstep with the national principles of the same parentage, has upheld and honored the right to present a defense before a jury in criminal trials for more than 150 years:

> In the trial of a criminal cause, the jury are to determine from all the evidence, as well that adduced by the accused as that adduced by the state, whether there is such reasonable doubt of the defendant's guilt as to entitle him to an acquittal under the provisions of our code; and it is error to so instruct the jury as to preclude them from considering any part of the defendant's evidence which is pertinent to the inquiry.

---

The State's evidentiary requirements, therefore, included proving: (1) Appellant entered the home of Complainant without consent, and (2) Appellant completed the commission of Aggravated Assault on Complainant. Appellant presented evidence, if believed, that would have negated the first element. This negation by itself would have defeated the burglary charged. Accordingly, if Appellant presented any evidence that tended to defend against the second element of burglary via completed commission of Aggravated Assault, his "defense [would be] a rational alternative to [his] criminal liability." This is because, if believed, it would have independently defeated the offense charged in addition to the lesser-included offense of Aggravated Assault. Here, Appellant—despite the trial judge's rulings— did just that: he supplied the modicum of self-defense evidence "sufficient to raise [the] defense because it could support a rational jury finding as to the defense."

(internal citation omitted). This Court also responded to the State's theory that if one party is using lawful force under Texas Penal Code Sections 9.31 and 9.32, the other party *per se* cannot be:

> We do not believe Sections 9.31 nor 9.32 can be used to make such reflexive renderings in the way the State proposes. Section 9.31(a) only applies to situations concerning the *actor* where both predicate conditions are met: (1) the actor *reasonably believes* use of force is immediately necessary; *and* (2) the actor *reasonably believes* the other's person's use or attempted use of force is unlawful. The statute remains silent on the actions and reasonable beliefs of the "other." We, therefore, cannot agree with the State's proposition that if one party is acting reasonably, the other can never be. Even under our standards of review, we acknowledge that "[r]easonable men may disagree" and can still remain reasonable. Thus, in the context of whether Appellant had reasonable beliefs to satisfy each predicate condition, the question should have been left to the jury as the fact-finder.

(internal citation omitted).

*Dorsey v. State*, 34 Tex. 651, 651 (Tex. 1870). This Court correctly continues to find these founding principles to be the course of wisdom. It is troubling, therefore, that a trial court could have exercised its *limine* power to unfairly prevent an accused person from being able to raise a valid rational defense.[3]

On October 26, 2022, in published opinions (*see* Attachments 1 & 2), this Court found that the exclusion of such evidence and the trial court's failure to properly charge the jury, was both error and harmful to Appellant and ordered a new trial. On that date this Court had no notice that Appellant had passed away. Both opinions have been published, circulated to the public via the internet, and discussed on two YouTube channels. Since our latest opinion was handed down, a 30-minute YouTube video was published by a Michigan attorney with a national audience.[4] Another twelve-minute YouTube video review of the case was also published by attorneys in Texas.[5] As of the date of this opinion, these episodes have been viewed more than 743,500 times, with roughly ten thousand more

---

[3] As a sobering reminder to all trial attorneys and judges alike, I would point to Texas Code of Criminal Procedure Article 2.03(b), titled "Neglect of Duty," which states:

> It is the duty of the trial court, the attorney representing the accused, the attorney representing the state and all peace officers to so conduct themselves as to insure a fair trial for both the state and the defendant, not impair the presumption of innocence . . . .

[4] Steve Lehto, *Court Refused to Let Man Argue Obvious Defense at Trial*, YOUTUBE (premiered Nov. 5, 2022), https://www.youtube.com/watch?v=3M2fI_gEJAg.

[5] Armed Attorneys, *Texas Ruling Could Bring New Self-Defense Claims Standard*, YOUTUBE (premiered Jan. 23, 2022), https://www.youtube.com/watch?v=VI5u6jJZzw0.

views just in the past three weeks. For comparative reference, the State Bar of Texas reported only a fraction of that number (108,000) as active attorneys in Texas in 2022 compared to those who verifiably know the details of this case. These two episodes have also generated over 27,300 likes and more than 5,600 comments—all predominantly finding the trial court's action unjust just as this Court did. But now, Appellant has been permanently silenced by his death while incarcerated at Texas Department of Criminal Justice. Moreover, in light of his death and in accordance with our rules, all appellate mentions of the wrongs he suffered and our rulings meant to cure them will be removed from our case law and mooted.

In 1879, an earlier iteration of this Court held that when a defendant dies during the pending appeal of his conviction for a criminal offense, his prosecution should abate *in toto*. *March v. State*, 5 Tex. App. 450, 456 (1879). The *March* Court reasoned that until the appeal has been finally resolved, "the guilt or innocence of the accused remains undetermined" and the case is "not definitely settled." *March*, 5 Tex. App. at 454. Quoting then Articles 742 and 744 of the Code of Criminal Procedure, the *March* Court declared that the defendant's contested conviction should remain contested because on appeal it could "be wholly reversed and dismissed, or may be remanded for further proceedings in the court below." *March*, 5 Tex. App. at 454–55. Thus, the *March* Court left the defendant

as the criminal justice system had found him—accused of a criminal offense but still possessing the presumption of innocence.[6]

The Court correctly continues this practice today.[7] I would further note that it would be futile not to do so because Appellant is now beyond any restraint the Texas criminal justice system might seek to enforce against him: he now stands before a higher justice. Nevertheless, though Appellant is deceased, he "did not take the potential errors of our justice system into the grave with him." *State v. Carlin*, 249 P.3d 752, 764 (Alaska 2011) (quoting *State v. McDonald*, 424 N.W.2d 411, 540 (Wis. 1988) (Heffernan, C.J., concur)). These errors that Appellant, himself, brought to the attention of this Court "remain behind to perplex and confound" the Texas legal system. *Id*.

Consequently, to remove these opinions without any explanation would not serve the best interests of the jurisprudence of this State. It would be a disservice to the Bar, and disingenuous, to act like this case never happened. This is because at the end of the day, although Appellant passed away while in TDCJ custody without this Court being notified,

---

[6] Among the most treasured principles in our American and Texan systems of justice is the requirement that all criminal defendants are presumed innocent until proven guilty beyond a reasonable doubt. *Coffin v. United States,* 156 U.S. 432, 453–54 (1895); *Hopt v. People*, 120 U.S. 430, 439 (1887); *Walker v. State*, 37 Tex. 366, 369 (Tex. 1872). Indeed, more than a century ago, the United States Supreme Court traced the venerable lineage of this fundamental principle to the Book of Deuteronomy as well as the laws of Sparta, Athens, and Rome. *Coffin*, 156 U.S. at 454–55. Texas law, a descendant of this legal tradition, has adhered to the doctrine throughout its history.

[7] "If the appellant in a criminal case dies after an appeal is perfected but before the appellate court issues the mandate, the appeal will be permanently abated." Tex. R. App. P. 7.1(a)(2).

the Court in fact granted Appellant a new trial based on the erroneous motion in limine filed by the State. This Court found that a new trial was warranted because the decisions of the trial court and the affirming court of appeals ultimately deprived Appellant of a constitutionally fair trial. Furthermore, though Appellant may be deceased, others in his predicament yet still alive may suffer the same deprivations of equal justice under law that Appellant faced. Under *numerous* variations of this case, I think such harmful errors against the accused would "evade review"—which in this case, it essentially did. *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). I see no reason to subject potentially numerous defendants in the future to such evasive constitutional harm before another case might arise where appellate review is even possible. Thus, under the facts of this case, though the Court formally withdraws all its opinions and orders the Thirteenth Court of Appeals to do the same, I leave our now-former opinion from October 26, 2022, and Judge Slaughter's concurring opinion of the same date attached to this opinion to guide against the "reasonable likelihood of repetition" by both the State and trial courts alike. *Spencer v. Kemna*, 523 U.S. 1, 18 (1998).

<Attached: Oct. 26, 2022 J. Richardson Majority opinion 664 S.W.3d 843 (Attachment 1), Judge Slaughter's Concurring opinion 664 S.W.3d 843 (Attachment 2)>

Filed: October 18, 2023

PUBLISH

# APPENDIX

# ATTACHMENT 1



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0242-19

## WILLIAM ROGERS, Appellant

### v.

## THE STATE OF TEXAS

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE THIRTEENTH COURT OF APPEALS
## REFUGIO COUNTY

RICHARDSON, J., delivered the opinion of the Court in which HERVEY, NEWELL, WALKER, SLAUGHTER, and MCCLURE, JJ., joined. YEARY and SLAUGHTER, JJ., filed a concurring opinion. KELLER, P.J., and KEEL, J., dissented.

## O P I N I O N

Appellant was originally charged in a two-count indictment for Burglary of a Habitation predicated on either the intent to commit a felony, or attempting and having

committed a felony.[1] Count I alleged that Appellant possessed the intent to commit Aggravated Assault in Paragraph A. Paragraph B alleged that Appellant completed the commission of the Aggravated Assault. Count II alleged in Paragraphs A and B a similar scheme but with the intent to Murder and the commission of Attempted Murder.[2] From the same incident but by a second indictment, Appellant was separately charged with Aggravated Assault with a Deadly Weapon. During a pretrial hearing, the State informed the trial court that they would: (1) waive and abandon Count I Paragraph A, and all of Count II, and (2) proceed solely on Count I Paragraph B—Burglary of a Habitation based on the commission of Aggravated Assault as charged in the first indictment.[3] The State also proceeded on the second indictment alleging Aggravated Assault and both were tried together.[4] Appellant was convicted of both Burglary of a Habitation with the underlying commission of Aggravated Assault, and Aggravated Assault with a Deadly Weapon.[5] Appellant was sentenced to 40 years for the Burglary and 20 years for the Aggravated Assault to be served concurrently.[6]

---

[1] There has been some confusion generated by the correct-but-simplified wording of the burglary charge that began at sentencing and continued through the appellate process. Here, we detail the initial charges and how they developed to clear up any misunderstandings.

[2] (1 CR 8).

[3] (3 RR 15–16).

[4] (1 CR 59–60; 4 RR 5–6).

[5] (13 RR 41–42).

[6] (13 RR 41–42; 1 CR 294–95).

On his first appeal, the Thirteenth Court of Appeals found that the Burglary conviction subsumed the Aggravated Assault conviction and thus, vacated the latter.[7] The court of appeals also held, without deciding error first, that the trial court's failure to instruct on any defensive issues was harmless. We granted review and unanimously held that if error existed, it was harmful error.[8] And we remanded for the court of appeals to decide whether the trial court erred in refusing to instruct the jury on self-defense and necessity.[9] The court of appeals then concluded that there was no error and that Appellant failed to provide any evidence that would entitle him to a jury instruction on self-defense or necessity.[10]

Following the court of appeals' opinion after remand in January 2019, we granted review for the second time. Having already decided harm unanimously, the only remaining legal issue is whether the error analysis was flawed. After a thorough review of the case, we conclude that the trial court erred by refusing to grant the requested defensive charge of self-defense and, as we previously held, that Appellant was harmed at every stage of the process.

## BACKGROUND

---

[7] *Rogers v. State*, 527 S.W.3d 329 (Tex. App.—Corpus Christi-Edinburg 2018).

[8] *Rogers v. State*, 550 S.W.3d 190, 196 (Tex. Crim. App. 2018).

[9] *Id*. at 193–94.

[10] *Rogers v. State*, No. 13-15-00600-CR, 2019 WL 150644, at *4 (Tex. App.—Corpus Christi-Edinburg Jan. 10, 2019).

Prior to jury selection, the State filed a pretrial motion in limine seeking to exclude facts that went to the heart of the Appellant's defense. Specifically, the State sought to prevent Appellant from raising any defensive issues during voir dire, opening statements, cross-examination, and even during Appellant's own testimony in the event he decided to testify. Despite a complete lack of testimony to support the State's motion, the trial court agreed with the State and ordered Appellant to comply with that motion and ruling. Appellant properly objected, and the trial court erred by overruling it.

*Testimony in Front of the Jury*

Appellant's testimony in front of the jury entitled him to the requested defensive charge of self-defense. Appellant testified that he had been engaged in a lengthy affair with Complainant's wife, Sandra Watson. It was Sandra who had given Appellant the passcode and key to her family home during their relationship. Appellant testified that he had entered the house on the day in question at Sandra's request to feed her cats. He parked his truck about a half-mile down the road, placed his .45 caliber handgun in his pocket, walked to the house, entered with the key provided by Sandra, and disengaged the house alarm. After feeding the cats, Appellant noticed Complainant approaching the house. Appellant testified he could not open the back door, so he went into the room Sandra described as her "sanctuary room" and tried to exit through a window that Sandra called her "escape route out of the house." In addition to the window being stuck, Appellant could not fit through the window, so he hid in "sanctuary room" closet, where Complainant kept many of his firearms in a gun safe. One of those guns was on top of the safe.

Appellant also testified that, while in the closet, he heard Complainant rummage around the house, before suddenly appearing at the closet door in an aggressive "linebacker stance" brandishing a hunting knife while moving it up and down. Complainant shouted "YOU" in a loud booming voice as he approached Appellant in the closet while still holding his knife. When Appellant came face-to-face with Complainant, who had his hunting knife in hand, Appellant grabbed from the top of the gun safe Complainant's loaded .380 caliber handgun. Appellant testified that at this point, Complainant, still holding the knife, reached forward and grabbed the gun, which discharged below Complainant's waist as they both struggled for the gun.

Appellant and Complainant testified about a struggle that ensued following the gunshot, but those versions are vastly different.[11] Although the trial court had previously stated in the pretrial hearing "that if it gets to where we have an instruction on self-defense, I will give you adequate time to explain that to the panel," that did not happen. When Appellant was questioned about his state of mind at that moment, rather than conduct any additional hearings outside the jury's presence, without any objection from the State, the trial judge ordered the direct examination of the Appellant to stop, excused the jury, and admonished him and his lawyer by stating "you may not venture off into anything that alludes to or invades the province of self-defense." This error on the part of the trial court deprived Appellant of his right to present a complete defense.

---

[11] *Compare* (10 RR 21–44) (Complainant's testimony) *with* (11 RR 116–214) (Appellant's testimony).

*Bill of Exception*

Appellant also provided additional testimony in a Bill of Exception. Specifically, Appellant's affair with Sandra Watson lasted from July 2011 until the date of the offense, February 14, 2013. According to Appellant, they exchanged over 70,000 text messages during their relationship. From February 10, 2013, to the date of the offense, Appellant and Sandra exchanged 850 messages, 187 of which were on the date of the offense. Appellant also testified that Sandra's husband, Complainant, had discovered the relationship between Appellant and Sandra two months before the offense by looking at Sandra's Facebook page. While we need not consider the Bill of Exception in this case, we mention it to highlight the actions of the trial judge, which prevented Appellant from putting on a complete defense.

To reiterate, the State sought and succeeded in keeping pertinent information from the jury based on the trial court's motion in limine ruling. That erroneous ruling prevented testimony that further corroborated Appellant was having an affair with Sandra Watson for almost two years, as well as any mention of the contents of text messages and photos of Sandra Watson individually or with Appellant. This evidence also would have corroborated Appellant's claim that he had permission to be at the house on the date in question.

## ANALYSIS

*Standard of Review*

When addressing a trial court's decision to deny a defensive issue in a jury charge, "we view the evidence in the light most favorable to the defendant's requested submission."[12] The usual deference to trial court rulings does not apply.[13]

Appellate courts review a claim of charge error through a two-step process: first determining whether error exists and then conducting a harm analysis if error is found to exist.[14] When the defendant preserves the alleged error, as Appellant has done in this case, the appellate court must reverse if the error caused him to suffer "some harm."[15] This Court previously ruled unanimously that any error in the present case was not harmless.[16]

*Appellant was Entitled to a Defensive Instruction on Self-Defense*

The Fifth, Sixth, and Fourteenth Amendments to the United States Constitution guarantee the accused in a criminal prosecution the right to "a meaningful opportunity to present a complete defense."[17] Moreover, the U.S. Supreme Court has explained, and this Court has reiterated that "[the] principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at

---

[12] *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006) (citing *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001)).

[13] *Id.*

[14] *Phillips v. State*, 463 S.W.3d 59, 64–65 (Tex. Crim. App. 2015).

[15] *See id.*

[16] *Rogers*, 550 S.W.3d at 196.

[17] *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).

the foundation of the administration of our criminal law."[18] We noted in *Kimble* that "[t]o implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process."[19]

Likewise, Texas law provides that a judge must provide the jury with "a written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury."[20] We have explained that "this law requires the trial judge to instruct the jury on statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence."[21] We have also said that "[a] defendant is entitled to an instruction on every defensive issue raised by the evidence, regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the testimony is not worthy of belief."[22] The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge.[23] Even a minimum quantity of evidence is sufficient

---

[18] *Kimble v. State*, 537 S.W.2d 254, 254–55 (Tex. Crim. App. 1976) (quoting *Coffin v. U.S.*, 156 U.S. 432, 453 (1895)).

[19] *Id.* at 255.

[20] *Walters v. State*, 247 S.W.3d 204, 208 (Tex. Crim. App. 2007) (quoting TEX. CRIM. PROC. art. 36.14).

[21] *Id.* at 208–09.

[22] *Id.* at 209.

[23] *Warren v. State*, 565 S.W.2d 931, 934 (Tex. Crim. App. 1978).

to raise a defense as long as the evidence would support a rational jury finding as to the defense.[24]

In this case, Appellant requested instructions on self-defense and necessity, and the record reflects that the errors of the trial court undermined fairness in the fact-finding process and violated Appellant's constitutional rights.

*Rational Alternative to Criminal Liability*

The State contends that the trial court should prohibit a jury from returning an irrational verdict.[25] Thus, the trial court, per the State, should refuse to give a defensive instruction unless "that defense is a rational alternative to the defendant's criminal liability."[26] Consequently, per the State's logic, it is categorically irrational to apply self-defense as a defense to burglary.

The State's theory, however, is dismissive of the fact that Appellant's burglary charge was based on the completed commission of Aggravated Assault. In fact, the court of appeals vacated a separate conviction for Aggravated Assault with a Deadly Weapon because it was subsumed by the instant Burglary conviction based on the same incident.[27] The State's evidentiary requirements, therefore, included proving: (1) Appellant entered

---

[24] *Shaw v. State*, 243 S.W.3d 647, 657 (Tex. Crim. App. 2007).

[25] The Office of the State Prosecuting Attorney appeared on this case following this Court's first remand to the court of appeals and raises this argument for the first time on appeal.

[26] State's Br. at 3 (quoting *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007)).

[27] *Rogers v. State*, 527 S.W.3d 329 (Tex. App.—Corpus Christi-Edinburg 2018).

the home of Complainant without consent, and (2) Appellant completed the commission of Aggravated Assault on Complainant.[28] Appellant presented evidence, if believed, that would have negated the first element. This negation by itself would have defeated the burglary charged. Accordingly, if Appellant presented any evidence that tended to defend against the second element of burglary via completed commission of Aggravated Assault, his "defense [would be] a rational alternative to [his] criminal liability." This is because, if believed, it would have independently defeated the offense charged in addition to the lesser-included offense of Aggravated Assault.[29] Here, Appellant—despite the trial judge's rulings—did just that: he supplied the modicum of self-defense evidence "sufficient to raise [the] defense because it could support a rational jury finding as to the defense."[30]

*Confession and Avoidance*

---

[28] (13 RR 41–42).

[29] "Nevertheless, a 'defendant is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or uncontradicted, and regardless of how the trial court views the credibility of the defense.'" *Maciel v. State*, 631 S.W.3d 720, 723 (Tex. Crim. App. 2021) (quoting *Celis v. State*, 416 S.W.3d 419, 430 (Tex. Crim. App. 2013) (citing *Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008))); *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007). A defensive issue is raised by the evidence "if there is evidence in the record making a prima facie case for the defense." *Shaw*, 243 S.W.3d at 657. "A prima facie case is that 'minimum quantum of evidence necessary to support a rational inference that an allegation of fact is true.'" *Id*.

Alternatively, if Appellant was entitled to his requested defensive instruction under the Aggravated Assault charge, it seems rational that he's entitled to the same for any other offense that subsumes the Aggravated Assault charge under the cognate pleadings approach. *See Hall v. State*, 225 S.W.3d 524, 533–34 (Tex. Crim. App. 2007) (adopting the cognate pleadings approach for determining lesser-included offenses).

[30] *Shaw*, 243 S.W.3d at 657.

Parallel to their arguments above, the State also argues that justification defenses adhere to the confession-and-avoidance doctrine. Although this case is under appellate review for the fourth time including twice at this Court, the State asserts the confession-and-avoidance argument for the first time. Under the State's theory, Appellant was not entitled to the requested defensive instruction because he did not admit to every element of the offense.[31]

However, as we have reaffirmed repeatedly, "[a]dmitting to the conduct does not necessarily mean admitting to every element of the offense."[32] Defendant was only required to show that his entitlement to the defensive instruction was "raised by the evidence." He did so by showing a "prima facie case" for his defense—he showed the

---

[31] We note that the Office of the State Prosecuting Attorney has advocated for an absolutist approach to the confession-and-avoidance doctrine in numerous cases. *Maciel v. State*, 631 S.W.3d 720 (Tex. Crim. App. 2021); *Rodriguez v. State*, 629 S.W.3d 229 (Tex. Crim. App. 2021); *Jordan v. State*, 593 S.W.3d 340 (Tex. Crim. App. 2020).

[32] *Gamino v. State*, 537 S.W.3d 507, 512 (Tex. Crim. App. 2017); *see Rodriguez v. State*, 629 S.W.3d 229, 233 (Tex. Crim. App. 2021) ("The evidence need not unequivocally show that the defendant engaged in the conduct."); *Maciel*, 631 S.W.3d at 725 ("[T]he confession-and-avoidance doctrine does not require an explicit admission from the defendant that she committed a crime."); *Juarez v. State*, 308 S.W.3d 398, 405 (Tex. Crim. App. 2010) (finding defendant was entitled to a defensive instruction even though he did not admit to the mental state element); *Martinez v. State*, 775 S.W.2d 645, 647 (Tex. Crim. App. 1989) ("Appellant admitted to pulling out the gun, firing it into the air, and having his finger on the trigger when the fatal shot was fired. While appellant specifically denied intending to kill Gonzales, this alone does not preclude an instruction on self-defense."); *Thomas v. State*, 678 S.W.2d 82, 85 (Tex. Crim. App. 1984) (finding entitlement to a necessity defense instruction for aggravated robbery even though defendant denied any intent to deprive the officer of his gun as part of the underlying theft); *Sanders v. State*, 632 S.W.2d 346, 348 (Tex. Crim. App. 1982) (holding that a manslaughter defendant was entitled to the requested self-defense instruction although he denied having any intent to harm the deceased); *Garcia v. State*, 492 S.W.2d 592, 596 (Tex. Crim. App. 1973) (finding defendant was entitled to a self-defense charge even where she stated she did not intend to shoot the gun that killed the victim).

"minimum quantum of evidence necessary to support a rational inference"[33] that he had consent to be in the home and that he shot Complainant with a gun he grabbed at the last second as he was being advanced upon by the knife-wielding Complainant. Furthermore, requiring admission to every element "would violate a court's duty to look at the evidence in the light most favorable to the requested instruction."[34] Doing so would invade the province of the jury as the fact-finder.[35]

Even though it was under an alternative explanation of circumstances, Appellant admitted to being in the house and pulling the trigger of the gun that shot Complainant. The trial court was obligated to view the evidence supporting the defensive charge in a favorable light. "Consequently, in a case of conflicting evidence and competing inferences, the instruction should [have been] given."[36]

*Self-defense*

---

[33] *Shaw*, 243 S.W.3d at 657.

[34] *Rodriguez*, 629 S.W.3d at 233; *see Liskosski v. State*, 3 S.W. 696, 698 (Tex. Ct. App. 1887) ("Any theory legitimately arising out of the evidence in a case imposes upon the court the duty of submission by appropriately instructing upon the law governing it; and this, without regard to the strength or weakness of the supporting facts. Uniform with the previous rulings of this court is the doctrine here declared, viz.: The charge of the court must make a pertinent application of the law covering every theory arising out of the evidence; that the duty is not dependent upon the court's judgment of the strength or weakness of the testimony supporting the theory, it being the prerogative of the jury to pass upon the probative force of the testimony.").

[35] *Rodriguez*, 629 S.W.3d at 231 ("Credibility is for the jury to decide; the courts' only role is to determine if there is some evidence—even if weak, inconsistent, or contradictory—that a rational jury could find supports the defense.").

[36] *Id.*

Under self-defense, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."[37] Additionally, under Section 9.32:

> A person is justified in using deadly force against another:
>
> (1) if the actor would be justified in using force against the other under Section 9.31; and
>
> (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
>
> (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or
>
> (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.[38]

This "use or attempted use of unlawful force" language is present in both Sections 9.31(a) and 9.32(a)(2)(A) of the Penal Code. Section 9.31 lays out the standard for the use of force in self-defense. However, the use of deadly force in defense of a person is governed by Section 9.32.[39] Similar language appears in both Sections 9.31(a) and 9.32(a)(2)(A), but the latter contains an additional, alternate prong in the form of Section 9.32(a)(2)(B).

---

[37] TEX. PENAL CODE § 9.31 ("Self-Defense").

[38] TEX. PENAL CODE § 9.32 ("Deadly Force in Defense of Person").

[39] *See Ferrel*, 55 S.W.3d at 591–92; *see also Werner v. State*, 711 S.W.2d 639, 644–45 (Tex. Crim. App. 1986), *holding modified by Hamel v. State*, 916 S.W.2d 491 (Tex. Crim. App. 1996).

Furthermore, and perhaps most important here, Section 9.32(c) provides that "[a] person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force as described by this section."

As we explained above, a defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge.[40] Appellant's testimony provides such evidence.[41] The court of appeals mischaracterized his testimony by stating that "there was no evidence that appellant reasonably believed that the use of force was immediately necessary to avoid imminent harm or to protect himself against [Complainant's] use or attempted use of unlawful force." The examples below make clear that Appellant raised evidence that would entitle him to a self-defense instruction.[42]

Testimony was presented to jury that showed the following:

(1) Appellant knew the names of Sandra Watson's cats, described their bowls and the location of the food in great detail, and fed them fifteen to twenty times.

---

[40] *Warren*, 565 S.W.2d at 934.

[41] *See Booth v. State*, 679 S.W.2d 498, 502 (Tex. Crim. App. 1984) ("We hold that the jury was entitled to accept or reject [appellant's] defensive theory" where appellant testified, though contradicted by other evidence, in support of his claim).

[42] The State describes our prior opinion as treating the encounter "as though the aggravated assault happened on a street or at a party." State's Br. at 9. The State also uses a similar one-sided view of the evidence to argue that there was no harm, or that our previous *unanimous opinion* finding harm should be reexamined. *Id.*; *Rogers v. State*, 550 S.W.3d 190, 196 (Tex. Crim. App. 2018). We reaffirm, however, that there was harm because a comprehensive review of the evidence shows that both the trial court and the court of appeals on remand ignored their time-honored obligation to "view the evidence in the light most favorable to the requested instruction." *Rodriguez*, 629 S.W.3d at 233; *Liskosski*, 3 S.W. at 698.

Appellant also testified this included the day in question because he placed them outside with food in them. Complainant also testified that he noticed the cat bowls were not in their usual spots because he regularly brought them back inside at night to prevent racoons from stealing their food.

(2) Appellant testified that had received a key, as well as the alarm code, to the house, from Sandra Watson.

(3) Detective De Leon testified that Appellant provided him the key to the house while he was being interviewed by the Detective on the day of the incident. Detective De Leon, per his testimony, then relied on the key to access the house so that the scene could be photographed and examined by police.

(4) Appellant and Sandra Watson had exchanged approximately 850 text messages and two phone calls the four days prior to and thru the day of the incident. About 187 of those text messages occurred on the day of the incident.

(5) Appellant explained that "the dimming of the light is [Complainant] jumping in front of the door holding a knife and he just shouts 'You' very loudly and he's in kind of a linebacker stance, he's got his knees bent and he's moving the knife up and down in his right hand."

(6) Appellant described that he took a step back as the Complainant started moving into the closet. Only then did he grab the Complainant's gun.

Under the State's logic, however, if one party is using lawful force under 9.31 and 9.32, the other party *per se* cannot be. Thus, per the State, if Complainant's use of force was lawful, then Appellant's response is rendered unlawful because his use of force can never be justified. We do not believe Sections 9.31 nor 9.32 can be used to make such reflexive renderings in the way the State proposes.[43] Section 9.31(a) only applies to situations concerning the *actor* where both predicate conditions are met: (1) the actor *reasonably believes* use of force is immediately necessary; *and* (2) the actor *reasonably*

---

[43] Under the law of distribution, the phrase "reasonably believes" must be applied to "immediately necessary" and all components of both subsections (A) and (B).

*believes* the other's person's use or attempted use of force is unlawful.[44] The statute remains silent on the actions and reasonable beliefs of the "other." We, therefore, cannot agree with the State's proposition that if one party is acting reasonably, the other can never be. Even under our standards of review, we acknowledge that "[r]easonable men may disagree" and can still remain reasonable.[45] Thus, in the context of whether Appellant had reasonable beliefs to satisfy each predicate condition, the question should have been left to the jury as the fact-finder.

We are also not certain, contrary to the State's presumption, that Complainant was automatically justified as a matter of law to utilize deadly force against Appellant, simply because he never gave Appellant consent to be there. First, Texas law does not blanket authorize the use of deadly force against trespassers—especially in the middle of the afternoon.[46]

Second, the State's position on consent is diametrically opposed to Fourth Amendment case law on apparent and actual authority.[47] The State's brief would have one believe that:

---

[44] The State also ignores the other prong under Section 9.31(a)(2): "to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery." Here, Appellant testified that he believed Complainant was about to assault him with a knife (a.k.a. Aggravated Assault with a Deadly Weapon).

[45] *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). This is not to say that all people who disagree are reasonable.

[46] *See* TEX. PENAL CODE § 9.42 ("Deadly Force to Protect Property").

[47] "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant . . . ." *Georgia v. Randolph*, 547 U.S.

1.  Appellant was never asked by Complainant's wife on the date in question to stop by the house and feed the cats;

2.  Appellant had not exchanged thousands of text messages with her—many on the day of the offense;

3.  Appellant had not been given both the key and alarm code to the home; and

4.  Complainant's step-daughter had not heard her mother ask Appellant to go to the house.

In the State's version of events, Complainant's wife simply had no authority to give Appellant consent to enter. Taking the State's theory to its logical conclusion, Complainant would have had an automatic right to shoot an invitee including any manner of repair or serviceperson who was legally there under the Complainant's wife's consent. This result would be unreasonable.[48] It is disingenuous on the State's part to convince the trial court pretrial, without any evidence, that defendant was not entitled to put on any of this evidence and then take the position this evidence never existed on appeal.[49] It is irrational and

---

103, 106 (2006); *Hubert*, 312 S.W.3d at 560. Actual authority gives rise to a valid consensual search where the third party "and the absent, non-consenting person share common authority over the premises or property. . . . [C]ommon authority is shown by mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Hubert*, 312 S.W.3d at 560–61; *see Burge v. State*, 443 S.W.2d 720, 722 (Tex. Crim. App. 1969) ("[I]t is well established in this State that a wife may consent to the search of her husband's premises where the consent is given without coercion."). "The fact that the relationship between the defendant and the third party has grown antagonistic will not necessarily vitiate consent." *Hubert*, 312 S.W.3d at 561.

[48] TEX. GOV'T CODE § 311.021 ("In enacting a statute, it is presumed that . . . a just and reasonable result is intended; . . . .").

[49] (3 RR 19–21; 8 RR 12–17; 11 RR 64–65).

inconsistent with the federal and Texas Constitutions, because it deprived him of putting on any defense.

Third, the evidence also raises questions on whether *Complainant's actions* were reasonable under Section 9.31. Appellant testified that although he had the right to be there, he tried to escape an awkward confrontation with his paramour's husband by leaving the house. Failing to escape, he tried to avoid discovery by hiding in Sandra's "sanctuary room" closet—somewhere he thought Complainant was least likely to go.[50] Upon discovery, according to Appellant, Complainant shouted "YOU!" while standing in a "linebacker" stance only roughly three feet away holding a knife with the tip pointed up.[51] Since Complainant was blocking the entrance, Appellant testified that he tried to retreat further (half step back) into the "sanctuary room" closet. Appellant further claimed that Complainant, while wielding the knife, came "fairly quickly" into the closet.[52] Thus, Appellant's accounting implicitly alleged that he reasonably believed Complainant's initiating use of force was unlawful. Because Appellant's facts and conclusion vary wildly from Complainant's testimony, the State's *per se* presumption of Appellant's unlawfulness was unjustified—it required a determination from the fact-finder to resolve the question.

Based on his testimony before the jury viewed under the most favorable light, Appellant was entitled to the defensive charges requested under the standards set out in

---

[50] (11 RR 122–26).

[51] (11 RR 131).

[52] (11 RR 132–33).

Section 9.32(a)(2)(B) and Section 9.32(c).[53] Appellant's testimony successfully raised a defensive issue, and "the jury was entitled to accept or reject that defensive theory": he had permission to be in the home, and he used deadly force in defense of his person to prevent his imminent murder.[54]

As this Court held in its prior opinion, the trial court placed an embargo on the defensive issues, and in doing so, prevented Appellant from presenting his defense at every step of the proceedings—during voir dire, opening statements, while testifying, while attempting to create a bill of exception, and while requesting the self-defense charge.[55] The Bill of Exception included the following evidence:

(1) Appellant and Sandra Watson exchanged thousands of text messages.
(2) Sandra Watson's daughter traveled to testify that she heard her mother ask Appellant to feed the cats, but she was only permitted to testify in the Bill of Exception.
(3) Appellant explained that he feared for his life, though he was not permitted to say so in front of the jury.

Excluding such evidence was error on the part of the trial court judge. Likewise, while Appellant was testifying, the trial judge went to great lengths to make certain no discussion of self-defense would come in despite acknowledging that Appellant had consent from one

---

[53] *Bufkin*, 207 S.W.3d at 782 (citing *Ferrel*, 55 S.W.3d at 591). We make no decision at this time whether the testimony in the Bill of Exception, interrupted and excluded by the trial judge, and not heard by the jury, would independently raise that issue, but it further bolsters the appellant's claim that the trial judge prevented the appellant from presenting a complete defense during every step of the proceedings, even during the Bill of Exception.

[54] *Booth*, 679 S.W.2d at 502.

[55] *Rogers*, 550 S.W.3d at 196.

homeowner, Sandra Watson, to be in the house.[56] That too was error. Appellant was given less than 25 minutes to create a bill of exception. These circumstances deprived Appellant of a meaningful opportunity to present a complete defense. Having decided Appellant is entitled to a self-defense instruction, this Court need not address necessity today.

## **CONCLUSION**

Both the trial court and court of appeals erred in this case. Accordingly, we reverse the decision of the court of appeals and remand to the trial court for further proceedings consistent with this opinion.

DELIVERED: October 26, 2022

PUBLISH

---

[56] The trial judge stated:

This is further explanation for the defense of this Court's position on the issue of self-defense or fearing for your life. I have advised Mr. Garcia that he cannot go into that and he cannot elicit testimony about whether Mr. Rogers was afraid of the situation that he found himself in in the Watson home for this reason. Mr. Rogers made a conscious decision on the morning of the 14th before he ever left Victoria, Texas to go to the home of David Watson without David Watson's consent. He did have Mrs. Watson's consent I'm convinced, but he also knew at that time that Mrs. Watson would not be present at the time he was at the home and he knew there was a possibility that David Watson could be there because David Watson was loose in the general public. The fact that he went to his home knowing that he did not have David Watson's consent and was, unfortunately, confronted by David Watson in that action takes away from him the right to claim self-defense because he created the situation that he found himself in and he cannot be in any way found to be defending himself once he creates the situation. So I'm advising you in the presence of your client and your co-counsel that you may not venture off into anything that alludes to or invades the province of self-defense. It's not self-defense by any definition, especially under Texas law.

(11 RR 139–40).

# APPENDIX

# ATTACHMENT 2



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

## NO. PD-0242-19

---

**WILLIAM ROGERS, Appellant**

**v.**

**THE STATE OF TEXAS**

---

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE THIRTEENTH COURT OF APPEALS
## REFUGIO COUNTY

---

**SLAUGHTER, J., filed a concurring opinion.**

## CONCURRING OPINION

I join the Court's opinion, which correctly reverses Appellant's conviction for

burglary of a habitation and remands the case for a new trial based on harmful jury-charge

error.[1] The narrow issue raised on discretionary review is whether the trial court harmfully

---

[1] I note here that Appellant was originally convicted of two offenses: burglary of a habitation under Penal Code Section 30.02(a)(3), and aggravated assault under Penal Code Section 22.02(a)(2). Because the burglary indictment alleged that Appellant had entered a habitation without the

erred by refusing Appellant's requested defensive instructions. Appellant did not raise the separate issue of the trial court's almost-complete exclusion of evidence that would have supported Appellant's request for those defensive jury instructions. In my view, the trial court's actions deprived Appellant of his right to present a complete defense. Thus, I feel compelled to address the issue even though it was not raised.

The trial court here did not simply make discretionary evidentiary rulings; it actively prohibited Appellant from raising or mentioning any justification defensive theories in front of the jury and refused to allow Appellant to present evidence that might have supported those theories. Appellant admitted to engaging in the charged conduct. Thus, based on a long line of precedent from this Court, the trial court was obligated to allow Appellant to present evidence supporting his justification defenses. Instead, the trial court's rulings and active interference, which prevented the jury's consideration of these justification defenses, significantly undermined Appellant's constitutional right to present a complete defense and ultimately deprived Appellant of his only real plausible avenue for acquittal. Given the circumstances here involving multiple related errors by the trial court, this Court's majority opinion correctly considers the totality of the trial court's conduct in determining that Appellant is entitled to a new trial.

## I. Background

### a. Relevant Facts

---

owner's effective consent and thereafter committed or attempted to commit aggravated assault, the court of appeals held that this allegation subsumed the facts required for the aggravated assault charge; thus, punishing Appellant for both offenses would violate double jeopardy. *Rogers v. State*, 527 S.W.3d 329, 336 (Tex. App.—Corpus Christi 2017). Accordingly, the court of appeals vacated the aggravated assault conviction. *Id.* Therefore, only the burglary-of-a-habitation conviction is before us at this juncture.

To provide a complete picture of the magnitude of the errors committed in this case, I believe it is important to highlight the evidence Appellant sought to introduce at trial. While some of these facts are addressed in the Court's opinion as evidence that was presented to the jury, I am also including additional facts that were not presented to the jury. We are aware of the following based on Appellant's presentation in a bill of exception.[2]

Appellant, a married man, was engaged in a long-term affair with Sandra Watson, a married woman. Appellant and Sandra met in June 2011 through a dating app. Sandra initially told Appellant she was widowed. Once she told him the truth, Appellant began helping Sandra devise a plan to leave her husband, David Watson. Despite never divorcing David, Sandra and Appellant dated seriously for nearly two years. In that time, they got together several times per week, shared a bank account, and exchanged an estimated 70,000 text messages – 187 of which were exchanged on the date of the offense, according to Appellant. They also exchanged house keys and alarm system passcodes for each other's homes. From time to time during the affair, Sandra had Appellant use her house key and alarm code to let himself into her house to feed her cats while she was away and David was at work.

---

[2] *See* TEX. R. APP. P. 33.2 ("To complain on appeal about a matter that would not otherwise appear in the record, a party must file a formal bill of exception."); TEX. R. EVID. 103(a)(2), (c) ("A party may claim error in a ruling to admit or exclude evidence" and "if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." . . . "In a jury trial, the court must allow a party to make the offer outside the jury's presence and before the court reads its charge to the jury. At a party's request, the court must direct that an offer of proof be made in question-and-answer form."). As this Court has previously acknowledged, "[t]he right to make a bill of exception is absolute" and "a trial court does not have discretion to deny a request to perfect a bill of exception." *Kipp v. State*, 876 S.W.2d 330, 333 (Tex. Crim. App. 1994).

Two days after Christmas in 2012, Appellant returned to his home after being away for the holiday to find that many items were out of place indicating that someone had been inside the home. Upon checking the alarm system, Appellant discovered that the passcode he set for Sandra was used to access the home. Appellant immediately messaged Sandra to ask why she had been in his house. Appellant received a response, but the message did not sound like it was from Sandra. It included language Sandra would not ordinarily use, was very vague, and was not signed "me" as was almost every one of her messages. When Sandra's response failed to confirm that she had not given Appellant's alarm passcode to anyone else, Appellant replaced his entire alarm system.

The next time Appellant and Sandra got together face-to-face, Sandra told Appellant that on Christmas Eve, David had gone through her Facebook account, read her messages, and discovered the affair. David had also seen Appellant's Facebook page, knew he was married, had his wife's contact information, and knew where Appellant worked. Sandra also disclosed that David had seen her personalized alarm code to Appellant's house.

A few weeks later, between February 10th and the 14th, Appellant estimated that Sandra sent him about 850 text messages. She also called him twice, which was highly unusual. During one of these phone calls, she was "real frantic" and told Appellant that she thought David was going to kill her cats. She asked Appellant multiple times to go to her house and check on them. On February 14th, after Sandra again urged Appellant to check on her cats, he responded that he was too busy that day. But Sandra was adamant. Eventually, Appellant relented after Sandra assured him that David would be working late and would not be at home.

So, on February 14th, Appellant stopped by Sandra's house on his way home from work, parked about half a mile away, used his key to get in, entered the alarm code to deactivate the system, and fed Sandra's cats. But, while Appellant was still inside the home, he saw David arrive. Because Appellant was unable to leave before David came inside, he hid in a closet. Inside this closet was a gun safe and one of the guns was sitting on top of the safe.

According to Appellant, David found him inside the closet, shouted "YOU!" in a "loud, booming voice," and lunged at him with a knife in his hand. Fearing for his life, Appellant grabbed the gun from on top of the gun safe. While the two fought over it, the gun discharged into David's groin. The struggle continued for some time, and they moved between rooms fighting over the knife and the gun. Eventually, Appellant was able to escape to his truck.

Appellant's version of events would have been supported by the testimony of Sandra's adult daughter, Catarina,[3] had the trial court allowed her to testify. According to Catarina's bill of exception testimony, Catarina accused Sandra of orchestrating the event between Appellant and David because it "didn't sound like [Appellant]." In response to Catarina's accusation, she claimed that Sandra "just said, well, I can see how you would think that but . . . And then she didn't say anything, she just kind of shrugged it off . . . ."

Catarina further offered that David was abusive both to her and to her mother. She claimed that David threatened her repeatedly. Specifically, he told Catarina that if she "ever

---

[3] Catarina is Sandra's biological daughter, whom Sandra left when Catarina was four years old. The two reconnected when Catarina turned 18, and Catarina then lived with Sandra and David for a time.

betrayed him that he could find [her] without . . . even trying, and that he could touch anyone in the world without even using his own hands." David "always scared [her]," so Catarina eventually moved out of the Watson home "so [she] wouldn't have to come back." As for David's abuse of Sandra, Catarina stated that she would see bruises on Sandra's arms and legs the morning following evenings when she heard them fighting. When she asked her mother why she stayed with David, Sandra replied that "once he died she'll get all his money" and that "if she wanted to she could just kill him."

### b. The trial court's exclusion of evidence.

As mentioned above, the trial court excluded much of Appellant's testimony at trial. The court did not permit Catarina to testify before the jury, and Sandra did not testify.[4]

The exclusion of Appellant's defensive evidence was initiated through the State's pre-trial motion in limine. The motion sought to exclude "[a]ny discussion during voir dire and/or trial on the merits of the laws relating to justification, necessity, apparent danger, self-defense, deadly force in defense of person, mutual combat, or consent to use of force." The trial court granted the motion but initially limited the ruling to voir dire. The court told defense counsel, "[I]f it gets to where we have an instruction on self-defense, I will give you adequate time to explain that to the panel." Then, while discussing pretrial motions before voir dire, defense counsel asked to revisit the motion in limine. The following exchange took place:

Counsel:    I don't know, Judge, how the Court can grant [the motion in limine] denying all our possible defenses without hearing any of the evidence. Not only that, it denied my client the presumption of innocence,

---

[4] It is unclear from the record why Sandra did not testify. It appears she was served with a subpoena, and during pretrial proceedings both the State and Appellant indicated that they expected her to testify.

> denies me the right to challenge for cause on a defensive theory and, thirdly, Your Honor, I can't even exercise a peremptory challenge intelligently if I can't go into the areas that I expect the testimony to show.
>
> [. . .]

Trial court: Any discussion during voir dire and/or trial on the merits of the law relating to this justification, necessity, apparent danger, self-defense, deadly force and . . . I've ruled on self-defense. I've ruled on deadly force in defense of person.

> [. . .]

Counsel: On those two, Judge. But here we don't even know what the background of that is going to be and that's a possible defense for the defendant and I need to voir dire the jury to see what their attitude is and whether they're going to follow the law if so instructed in that area.

> [. . .]

Trial court: I've already ruled on those motions, I'm not going to reconsider them.

Counsel: I cannot talk to the – I just want to clarify for the Court. I cannot talk to the jury about these items to voir dire?

Trial court: No. You cannot talk to the jury about anything that would constitute a self-defense or justification for the actions of your client. It's the same thing.

Counsel: Well, I understand, Judge. Without getting a jury that's going to listen to the testimony wherein you might instruct on a necessity or a self-defense once you hear the testimony, I'm picking a jury blindfolded. I don't know what their attitude is. Maybe they said there's no defense at all ever. And I don't have a – and I might have a possible challenge for cause but I also would have a peremptory challenge and I can't exercise it if I don't talk to them about it. And that's the Court's ruling?

Trial court: Yes.

Through this exchange, the trial court issued a clear prohibition on any discussion of justification defenses during voir dire. The question of whether Appellant could introduce evidence supporting a justification defense during trial, however, was left unresolved.

In response to another pretrial motion, the trial court ruled that evidence of the affair between Appellant and Sandra must be excluded because it is "not relevant." Initially, the court acknowledged that such evidence may go to witness bias and could therefore be used as impeachment evidence, particularly as it related to Sandra's husband. However, during trial the court consistently sustained the State's objections to the defense's questions seeking to elicit testimony about the affair. And during David's testimony, he never mentioned Appellant's and Sandra's affair, claimed to have no knowledge of who Appellant was at the time of the incident, and said that he only learned Appellant's name from the police afterwards. Appellant was not allowed to challenge this testimony.

By the time Appellant took the stand, the trial court had made clear that it would not allow Appellant to raise any justification defenses. It solely permitted him to introduce a minimal amount of defensive evidence through his own testimony—namely, that Sandra had asked him to feed her cats on the day in question, and that he had been given a key and the alarm code to enter the house. Appellant was also able to testify that David was armed with a knife when he entered the closet and shouted, "YOU!" upon seeing Appellant. But aside from these basic facts, Appellant was not permitted to delve into any of the evidence regarding the affair, his prior connection to David, or his mental state at the time of the conduct, all of which might have supported his claim of self-defense.

For example, during Appellant's direct examination, the trial court, *sua sponte*, interrupted Appellant's testimony and initiated a discussion with counsel off the record. The judge's interruption came immediately after defense counsel asked Appellant to

describe his mental state during the altercation. After an off-record discussion at the bench, the court went back on the record, outside the presence of the jury, and said:

> This is further explanation for the defense of this Court's position on the issue of self-defense or fearing for your life. I have advised [defense counsel] that he cannot go into that and he cannot elicit testimony about whether [Appellant] was afraid of the situation that he found himself in in the Watson home for this reason. [Appellant] made a conscious decision . . . to go to the home of David Watson without David Watson's consent. He did have Mrs. Watson's consent I'm convinced, but he also knew at that time that Mrs. Watson would not be present at the time he was at the home and he knew there was a possibility that David Watson could be there because David Watson was loose in the general public. The fact that he went to his home knowing that he did not have David Watson's consent and was, unfortunately, confronted by David Watson in that action takes away from him the right to claim self-defense because he created the situation that he found himself in and he cannot be in any way found to be defending himself once he creates that situation. So I'm advising you in the presence of your client and your co-counsel that you may not venture off into anything that alludes to or invades the province of self-defense.

In response, defense counsel made clear that he disagreed with the court's ruling but would adhere to it.

The trial court's interruptions were not just reserved for the trial testimony. It also interfered with Appellant's bill of exception testimony. Within the first few minutes of questioning on the bill of exception, the trial court interrupted Appellant's testimony and asked, "Are all of your proffers going to be this long?" And when counsel asked Appellant about his mental state during the altercation, the trial court incorrectly told counsel that he was "rehashing stuff" that had already been covered during Appellant's examination before the jury. This statement was untrue because, as noted above, the court had prevented Appellant from testifying about his mental state in front of the jury. In response, counsel explained that he was "trying to get in parts that maybe were not [covered]." The trial court,

however, indicated that the defense had lost its chance: "If they're not in the record then they're not in the record because [lead defense counsel] elected not to ask questions about them. I'm not going to let you retry that part of the case that has already been tried."

When defense counsel attempted to create bills of exception for the additional witnesses that the trial court had barred from testifying, the judge again interfered. During Catarina's bill of exception testimony, the trial judge interrupted to tell defense counsel that they were taking too much of the court's time and that counsel was limited to five minutes for completion of Catarina's and a third witness's bill of exception testimony. After that, the court would not entertain any further testimony.

When counsel moved on to the next witness, he promised the court that while it would be short, he needed to question two witnesses rather than one. In response, the trial court again expressed frustration with the defense: "[Counsel], you're infringing on the patience of the Court. This is crazy." Counsel explained that he needed "to get this in for the record" and gave a brief explanation of the testimony. The first witness's purpose was to corroborate Appellant's account about him taking care of Sandra's cats. The court declined "to receive that evidence" because it was "not relevant to any issues in the case." It did, however, allow testimony from the second witness, who testified that Appellant had previously taken care of his animals (and vice versa), and Appellant would use a key and security codes to get into his house. In all, the trial court only allowed the defense about 25 minutes to create bills of exception for all its witnesses, including Appellant himself.

## II. The trial court's rulings collectively interfered with Appellant's ability to present a complete defense.

Having laid out the evidence excluded at trial, it is clear that the trial court's actions collectively undermined Appellant's ability to defend himself. It certainly should have been clear to all the parties involved that Appellant was left practically defenseless as a result of the trial court's rulings and active interference.

The United States Constitution "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). When a trial court's rulings collectively operate to undermine a defendant's fair opportunity to defend himself, due process concerns are implicated. A court's evidentiary rulings excluding evidence might rise to the level of a constitutional violation under two scenarios: first, "when a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence which is vital to his defense; and" second, "when a trial court's clearly erroneous ruling excluding otherwise relevant, reliable evidence which forms such a vital portion of the case effectively precludes the defendant from presenting a defense." *Williams v. State*, 273 S.W.3d 200, 232 (Tex. Crim. App. 2008) (citing *Potier v. State*, 68 S.W.3d 657, 659–62 (Tex. Crim. App. 2002)). "In other words, the erroneous ruling" implicates the Constitution if it "goes to the heart of the defense." *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002).

The trial court's rulings in this case collectively rise to the level of a constitutional violation. Here, the trial court consistently precluded the possibility of multiple defensive theories—often on its own accord without prompting by the State—and regularly expressed frustration with defense counsel for attempting to develop a defense. Ultimately,

this case is a prime example of the ways in which a trial court's evidentiary rulings can undermine "the heart of the defense." *See Wiley*, 74 S.W.3d at 405.

While not all the testimony within the bills of exception would have been admissible, much of it was. And if admitted, this evidence would have significantly enhanced Appellant's ability to raise the defensive issues before the jury. For example, whereas Appellant was wholly prevented from addressing his mental state before the jury, had he been permitted to do so he could have explained that he was in fear for his life when he saw David entering the closet with a knife. He could have also provided context and explanation about his history with David and Sandra, including that David had learned about his affair with Sandra shortly before the incident. This would have provided a possible motive for David to act aggressively towards Appellant. Appellant's testimony on this point might have also undermined David's credibility, given that David did not acknowledge knowing Appellant and instead told police that Appellant was a "stranger" who wanted to rob him. Further, Catarina's testimony could have corroborated much of Appellant's story about his relationship with Sandra and could have called into question David's credibility by alleging that he was abusive and had threatened both Catarina and Sandra. In all these ways, the additional evidence the jury did not hear deprived it of a complete picture of the events. Coupled with the absence of Appellant's requested instructions, the jury was left with virtually no option but to convict Appellant. In short, but for the trial court's interference with Appellant's defense, Appellant would have introduced additional, and far more compelling, evidence to support the requested defensive jury instructions.

A series of erroneous rulings such as occurred here can cause ripple effects throughout a case that ultimately may render the proceedings fundamentally unfair in violation of due process. Here, regardless of whether Appellant's version of events or excluded testimony was credible, I have no doubt that he was deprived of a fair opportunity to have the jury decide these issues. It is the jury's province to evaluate the credibility of defensive evidence, not the trial judge's.[5] The trial court denied Appellant his fundamental right to have the jury pass on the issue of his guilt after having a complete picture of the relevant facts. Not only did the court prevent the introduction of evidence to support justification defense jury instructions, it also then wrongly faulted Appellant for failing to introduce sufficient evidence to support the requested charges. Simply put, it all comes down to the trial court's improper interference with Appellant's ability to defend himself at trial.

## III.    Conclusion

---

[5] Along these same lines, I note that the State Prosecuting Attorney's Brief in this case asserts that, even accepting Appellant's version of events as true, as a matter of law, he could not claim self-defense in this case. The basis for this assertion is that Sandra's husband's use of force against Appellant would have been lawful in any event because Appellant was found hiding in the bedroom closet. *See* SPA's Brief on Discretionary Review, at 2 (contending that Appellant was not entitled to a self-defense instruction as a matter of law; "no jury should be permitted to acquit a defendant who shoots someone he knows is a homeowner who has no reason to expect to find the defendant hiding in his bedroom closet"); *see also* TEX. PENAL CODE § 9.31(a) (providing that use of force is justified when the actor reasonably believes it is "immediately necessary to protect the actor against the other's use or attempted use of *unlawful* force") (emphasis added). But the question of whether David had reason to expect to find Appellant in his home presented a fact issue for the jury. That is to say, at least some evidence suggested that David knew who Appellant was before the assault, knew of the affair between Appellant and Sandra, and perhaps even suspected or knew that Appellant had been asked to go feed the cats on the day in question. Had Appellant been permitted to fully develop the defensive testimony on these matters, perhaps there would have been a rational basis for the jurors to find that David was not threatened by Appellant but was instead the aggressor, thereby making his impending use of force against Appellant unlawful. Thus, under these particular circumstances, I cannot agree that this Court should hold that self-defense was precluded as a matter of law.

The Court correctly reverses Appellant's conviction and remands for a new trial based on harmful jury-charge error. Even without the wrongly excluded evidence and the trial court's interference, Appellant managed to introduce just enough evidence to entitle him to the requested instruction on self-defense. What is more, the trial court's erroneous exclusion of Appellant's defensive evidence seriously undermined Appellant's ability to present a complete defense and, had it been raised, this would have constituted an additional basis for reversal. With these additional thoughts, I join the Court's opinion.

FILED: October 26, 2022
PUBLISH